**UNITED STATES of America,**

v.

**Martha STEWART and Peter Bacanovic, Defendants.**

**No. 03 CR.717(MGC).**

United States District Court, S.D. New York.

May 5, 2004.

Michael S. Schachter, Assistant United States Attorney, Mary Jo White, United States Attorney, Criminal Division, New York City, for Plaintiff.

John J. Tigue, Jr., Rebecca A. Monck, Robert G. Morvillo, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York City, for Defendants.

## OPINION

CEDARBAUM, District Judge.

Defendant Martha Stewart moves for a new trial pursuant to Fed.R.Cr.P. 33 or, alternatively, an evidentiary hearing into alleged juror misconduct. Her co-defendant, Peter Bacanovic, joins this motion.[1] For the following reasons, the motion is denied.

### Background

Stewart and Bacanovic were indicted in June 2003 and charged with conspiracy, making false statements to government officials, and obstruction of an agency proceeding. Bacanovic was also charged with perjury and making and using a false document, and Stewart with securities fraud.

Because the extraordinary publicity surrounding the case presaged difficulty in finding an unopinionated jury pool, a two-part *voir dire* process was used. Several hundred jurors were summoned to the courthouse to fill out a questionnaire that the parties had jointly drafted. The Government and defendants then reviewed the completed questionnaires. After challenges for cause, the remaining prospective jurors returned to the courthouse for individual questioning.

Among many other areas of inquiry, the questionnaire sought to determine each prospective juror's prior contact with the justice system. One question asked whether the juror had ever appeared in court. Another asked whether the juror, or someone close to the juror, had ever been a victim of a crime, filed criminal charges, been sued by someone, or been accused of wrongdoing on a job. Another question asked whether the juror or a family member or close friend had ever been questioned by law enforcement, accused of, charged with, or convicted of any crime.

Chappell Hartridge was among the prospective jurors who returned for individual questioning. In his questionnaire, Hartridge explained that he had appeared in court in a dispute with his landlord. He responded in the negative to all of the other questions described above. Hartridge was subsequently empaneled as Juror 8.

After a five-week trial, the jury convicted Stewart of all four of the counts against her,[2] and convicted Bacanovic of four of the counts in which he was charged, acquitting him of one. In the days following the return of the verdict, several members of the jury, including Hartridge, spoke with the press concerning their experiences as jurors in this case.

Defendants now move for a new trial pursuant to Fed.R.Cr.P. 33, claiming that they were deprived of their right to a fair

---

1. After joining Stewart's motion, Bacanovic submitted a "reply" to the Government's opposition, as well as a separate motion. Both raise different grounds for relief. These submissions will be dealt with in a separate opinion.

2. Defendant Stewart's motion for a judgment of acquittal of a charge of securities fraud was granted before the case was submitted to the jury. *See United States v. Stewart,* 305 F.Supp.2d 368 (S.D.N.Y.2004).

trial because Hartridge deliberately concealed material information in his jury questionnaire.

## Discussion

### I. Legal Standard

 Unquestionably, it is the court's duty to ensure that every criminal defendant receives a fair trial. An essential component of fairness is an impartial jury, and *voir dire* serves to protect the defendant's right to an impartial jury "by exposing possible biases, both known and unknown, on the part of potential jurors.... The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious." *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 554, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984).

 However, a defendant who seeks a new trial based on allegations of juror misconduct faces a very high hurdle. As the Supreme Court explained, "full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct." *Tanner v. United States,* 483 U.S. 107, 120–21, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). Accordingly, "courts are, and should be, hesitant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences." *United States v. Moon,* 718 F.2d 1210, 1234 (2d Cir.1983). Such inquiries are not mandatory; rather, "a trial court is required to hold a post-trial jury hearing only when reasonable grounds for investigation exist. Reasonable grounds are present when there is clear, strong, substantial and incontrovertible evidence, that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant." *Id.* (citation omitted). Were it otherwise, the policy of restraint that governs postverdict inquiries

into juror conduct could be circumvented at the defendant's option, no matter how ill-founded or farfetched the demand.

 *McDonough* governs claims that a juror's failure to respond accurately to *voir dire* questions jeopardized the fairness of a defendant's trial. During juror questioning in *McDonough*—a personal injury suit arising from a lawnmower accident—prospective jurors were asked whether they or any of their family members had ever suffered an injury that had resulted in disability or prolonged pain and suffering. After the jury returned a verdict in favor of the plaintiff, the defendant moved for a new trial, having learned that one juror, who had answered that question in the negative, had a son who had been injured by an exploding truck tire. The district court denied the motion, and the Supreme Court agreed, noting that the juror apparently believed that his son's injury did not fall within the category of injuries that the question contemplated. *See McDonough,* 464 U.S. at 555, 104 S.Ct. 845. Recognizing that every defendant "is entitled to a fair trial but not a perfect one, for there are no perfect trials," *id.* at 553, 104 S.Ct. 845 (quoting *Brown v. United States,* 411 U.S. 223, 231–32, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973)), the Court set out a multi-part test to govern the analysis of such motions:

> [A] party must first demonstrate that a juror failed to answer honestly a material question on *voir dire,* and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

*Id.* at 556, 104 S.Ct. 845. Accordingly, under the *McDonough* test, a court must first find that a juror answered a question

dishonestly. The Second Circuit has noted that a "good faith failure to respond, though mistaken, [does] not satisfy ... the first prong of the test." *United States v. Shaoul,* 41 F.3d 811, 815 (2d Cir.1994) (citing *McDonough,* 464 U.S. at 555, 104 S.Ct. 845). The court must then determine whether it would have granted a challenge for cause based on a truthful answer. *See United States v. Greer,* 285 F.3d 158, 171 (2d Cir.2002). Challenges for cause are generally based on a finding of bias. *See id.* (citing *United States v. Torres,* 128 F.3d 38, 43 (2d Cir.1997)).

■■ The difficulty of this showing is evident from the fact that no verdict in the Second Circuit has been overturned on the basis of juror nondisclosure under the *McDonough* test. In some cases, defendants fail to satisfy the first prong of the test: showing that the juror in controversy failed to answer a question honestly. *See, e.g., Shaoul,* 41 F.3d at 816 (affirming the district court's denial of the defendant's Rule 33 motion where the defendant conceded the juror's good faith and the court found that the juror's distant familial relationship with an Assistant United States Attorney did not require a finding of implied bias). But even where a juror deliberately omitted or misstated facts during *voir dire,* a new trial will not be granted absent a finding that the juror's nondisclosure concealed some bias or partiality that would have sustained a for-cause challenge. In *United States v. Langford,* 990 F.2d 65 (2d Cir.1993), for example, the defendant learned after a guilty verdict had been returned that a juror had deliberately concealed several arrests and criminal convictions. However, the district court found no evidence that the juror lied from a desire to sit on the jury, or from some prejudice against the defendant—rather, she had simply wished to avoid embarrassment and the possible public exposure of her criminal history. The Second Circuit affirmed the district court's

denial of the defendant's motion. *See id.* at 69–70. In *Greer,* a juror had failed to disclose during *voir dire* that a close friend of the defendant's had contacted him prior to jury selection and asked him to be a "sympathetic ear" on the jury. The Second Circuit affirmed the district court's determination that despite his failure to disclose, the juror demonstrated no bias that would support a for-cause challenge. *See Greer,* 285 F.3d at 171–72. These cases demonstrate that a defendant seeking a new trial because of juror nondisclosure must satisfy both prongs of the *McDonough* test. *See id.* at 170; *Shaoul,* 41 F.3d at 816.

In only one case has the Second Circuit found grounds to remand a case for an inquiry into possible juror nondisclosure. In *United States v. Colombo,* 869 F.2d 149 (2d Cir.1989), the defendant produced the affidavit of a juror who stated that another juror confided that she had deliberately refrained from disclosing the fact that her brother-in-law was a government attorney because she wanted to remain on the panel. The juror in controversy was also alleged to have told the affiant that a certain location, mentioned at trial as a meeting place for defendant and his associates, was a "hang out for gangsters." *See id.* at 150. The Second Circuit found that if this affidavit were accurate, "the juror's motive in lying on the *voir dire* was precisely to prevent defense counsel ... from acting on information the juror believed might lead to her dismissal from the case." *Id.* at 151. In other words, an inference of bias was permissibly drawn from the juror's stated wish to remain on the panel because the information she withheld betrayed her partiality toward the Government. After remand, the hearing revealed that the juror had made no such statements and possessed no partiality toward the Government, and the Second Circuit upheld the district court's denial of the

defendant's renewed motion. *See United States v. Colombo*, 909 F.2d 711, 713 (2d Cir.1990).

## II. *Bases for Defendants' Motion*

Defendants offer the following five allegations to support their claim that Hartridge's questionnaire betrays a pattern of deliberate omissions that concealed his bias against them: (1) Hartridge was once arrested and arraigned for assault; (2) Hartridge and several of his family members have been sued; (3) Hartridge's son was convicted of attempted robbery; (4) Hartridge was accused of embezzlement while volunteering as treasurer of a Little League; and (5) Hartridge was terminated from a job for wrongdoing.

It should be pointed out that many of the allegations offered to support these claims amount to little more than hearsay, speculation, and in one instance, vague allegations made by a person who refused to identify himself. However, each of defendants' claims is examined in detail below.

## A. *Hartridge's Arrest*

Defendants contend that Hartridge deliberately failed to disclose that he had been arrested and arraigned for assaulting his former girlfriend. Defendants submit an affidavit from the girlfriend, Gail Outlaw, who describes the incident and states that she later dropped the charges. Defendants argue that this information demonstrates that Hartridge lied when he answered "no" to the following questions: "Have you or has anyone close to you ever: Been a victim of a crime? [or][m]ade criminal charges against someone?" and "Have you or has a family member or close friend ever been questioned by law enforcement, accused of, charged with, or convicted of any crime, or been the subject of a criminal investigation, other than a minor traffic violation?" In addition, defendants argue that Hartridge lied when he answered the question, "Have you ever been in court

before, other than for a minor traffic violation?" by disclosing only a dispute with his landlord.

Even assuming that Outlaw's affidavit accurately describes Hartridge's criminal history, it is not clear that defendants have satisfied the first prong of the *McDonough* test. As an initial matter, there is ambiguity in each of the questions that defendants highlight. The Supreme Court has recognized that "jurors are not necessarily experts in English usage. Called as they are from all walks of life, many may be uncertain as to the meaning of terms which are relatively easily understood by lawyers and judges." *McDonough*, 464 U.S. at 555, 104 S.Ct. 845. Would a reasonable juror necessarily consider an ex-girlfriend to be "someone close to him?" Does a question that does not ask specifically about arrests and arraignments require disclosure of those things when the charges were later dropped? The parties in this case had the opportunity to draft the questions exactly as they wanted them. They cannot now demand a new trial because a juror failed to place the broadest possible construction on those questions.

The Government points out that Hartridge may have believed that he was not obliged to disclose the arraignment and dropped charges. New York Criminal Procedure Law § 160.60 provides that upon the dismissal of a criminal action against a defendant,

> the arrest and prosecution shall be deemed a nullity and the accused shall be restored, in contemplation of law, to the status he occupied before the arrest and prosecution.... Except where specifically required or permitted by statute or upon specific authorization of a superior court, no such person shall be required to divulge information pertaining to the arrest or prosecution.

Because his record was sealed and the charge dismissed, Hartridge may have understood that he was under no obligation to disclose the arrest on the questionnaire.[3] If so, he did not answer the questionnaire dishonestly.

■ But even if Hartridge deliberately concealed his arrest and arraignment, defendants have not shown that these facts would have provided a sufficient basis for a challenge for cause. Defendants have cited no authority for the proposition that a prospective juror who has been arrested but not convicted of a crime faces a *per se* bar to jury service in a case involving entirely unrelated crimes. Indeed, during *voir dire*, Stewart argued vigorously against the Government's challenge to a prospective juror who failed to disclose that she had been the target of a securities fraud investigation and had been questioned by the United States Attorney's Office and the Securities and Exchange Commission.

Defendants argue instead that because other prospective jurors with criminal histories were successfully challenged, Hartridge would have been excused had his criminal background been revealed. However, as the Government points out, those for-cause challenges resulted from the parties' agreement, not from the court's analysis of each challenged juror's ability to be impartial. The question now is whether Hartridge's omission reveals a bias sufficient to support a for-cause challenge: *See Greer*, 285 F.3d at 171; *Torres*, 128 F.3d at 43.

In responding to that issue, defendants characterize the assault charge as a "gender-related incident" that permits an inference of gender bias. Essentially, defendants ask this court to presume that Hartridge is guilty of the assault despite the fact that the charges were dropped. Even if that presumption of guilt were permissible, the fact that Hartridge assaulted his girlfriend does not support a rational inference that he would contrive to be empaneled on this jury and vote to convict *both* defendants because one was a woman.

Defendants make two additional arguments concerning Hartridge's bias, which they rely on for all of their claims of prejudicial nondisclosure. First, they contend that Hartridge made post-trial statements to various news organizations that demonstrate a class bias and a desire to scapegoat Stewart.[4] They claim that the court can infer from the substance and frequency of those comments, and from a

---

3. Indeed, Stewart's motion to unseal the record of Hartridge's alleged misdemeanor arrest, filed in the Supreme Court of New York County, was denied as not in the interests of justice. *See In the Matter of Chappell Hartridge*, No. 30059/04 (N.Y.Sup.Ct. Apr. 28, 2004).

4. Among the statements that defendants point out as indicative of Hartridge's bias are his characterization of the verdict as "a victory for the little guy who loses money in the markets because of these types of transactions" and "a message to the bigwigs that they have to abide by the law and no one's above the law," and his speculation that "[i]nvestors may feel a little more comfortable now that they can invest money in the market and not worry about these scams and that they'll lose their 401(k)." Defendants also point to specific references to Stewart in Hartridge's commentary, including: "Maybe she thought she was above everything and didn't have to do things other people have to do"; "She was a former stockbroker, so she should have known better"; and that, in choosing not to testify, Stewart seemed to say " 'I don't have anything to worry about. I fooled the jury. I don't have anything to prove.' " For the purposes of this motion it is assumed that Hartridge made these statements, although it should be noted that the newspaper reports attached to defendants' papers are not admissible evidence of the actual statements of the juror.

hearsay allegation that Hartridge attempted to receive compensation for one media appearance, that his bias and his impermissible agenda motivated him to lie about the arrest and other incidents in his past in order to remain on the jury panel. Second, defendants argue that evidence that a juror lied out of a desire to be empaneled is sufficient to support an inference of bias.

Even if these post-verdict statements may be considered, they do not satisfy prong two of the *McDonough* test. First, and most importantly, they do not show that Hartridge was biased against Stewart, either before or after the trial. That Hartridge spoke of the verdict's broader message does not reveal an agenda to punish the wealthy and powerful—he was very likely responding to questions that invited him to speculate about the impact of the verdict. In addition, to read Hartridge's use of the phrases "little guys" and "bigwigs" as evincing class bias places far too great a semantic burden on these commonly used shorthand phrases. Hartridge's suggestion that the verdict may persuade powerful people to abide by the law is an accurate characterization of the general deterrent effect that Stewart's conviction may have, not evidence of a long-held personal grudge against Stewart. And Hartridge's remarks concerning how ordinary investors may have greater faith in the stock market as a result of this verdict do not reveal that he prejudged the case. They reveal that Hartridge understood that Stewart obstructed an investigation whose purpose was to determine whether the laws that ensure the integrity of the securities market had been violated, and that investors might take heart in knowing that such investigations are prosecuted vigorously.

Nor does Hartridge's willingness to be interviewed in the days following the verdict—a trait shared by half of the jurors—support an inference that he was biased against defendants. Hartridge would have garnered the same amount of media attention after a verdict of acquittal.

To the extent that Hartridge's comments reveal a negative attitude toward Stewart, it is important to recognize that these comments came after a trial during which the Government presented credible evidence sufficient to persuade the jury beyond a reasonable doubt that she committed the crimes of which she was convicted. In other words, defendants have not offered any evidence that Hartridge possessed a negative attitude toward Stewart *before* he heard the evidence presented in this case.

Defendants also make the related argument that Hartridge's media appearances, and his unsubstantiated attempt to receive compensation for one of them, betray a desire to sit on the jury and support an inference that he lied on his questionnaire in order to fulfill that desire. They cite *Colombo* for the proposition that evidence that a juror deliberately omitted information during *voir dire* in an attempt to remain on a jury creates an inference of partiality sufficient to justify a new trial. As noted above, Hartridge's post-trial statements do not give rise to an inference that he desired to be empaneled on the jury. Furthermore, in *Colombo*, the defendant did not seek to prove the juror's bias by reference to external statements; rather, the substance of the undisclosed information gave rise to the inference that the juror was biased against the defendant. *See Greer*, 285 F.3d at 172–73 ("[I]n *Colombo I*, it was not simply that the lies in question were deliberate, but that *the deliberateness of the particular lies evidenced partiality*." (emphasis in original)). *Colombo* does not hold that deliberate omissions that are prompted by a desire to serve, but which do not show bias or prejudice, should overturn a jury verdict. Such

a holding would be at odds with *McDonough's* requirement that the undisclosed information suffice to support a for-cause challenge. Subsequent Second Circuit opinions suggest that this would be an overly broad reading of *Colombo*. *See, e.g., Greer,* 285 F.3d at 173 *("Colombo I* did not eliminate the second prong of the *McDonough* test. It simply held that a lie which simultaneously demonstrates both dishonesty and partiality on the part of the juror will satisfy both prongs of the test.").

Defendants also rely heavily on a Ninth Circuit case, *Dyer v. Calderon,* 151 F.3d 970 (9th Cir.1998) *(en banc* ), to argue that bias may be inferred when a juror lies in order to remain on a jury panel. In that case, the court reversed the lower court's denial of a petition for a writ of habeas corpus that was based on allegations of prejudicial juror nondisclosure during *voir dire.* While the Ninth Circuit does discuss the troubling implications of jurors' lying in order to remain on a jury for any reason, *see id.* at 982, the substance of the nondisclosure found in that case clearly showed the juror's bias against the petitioner, *see id.* (noting that the juror had failed to disclose that her brother had been murdered in a way similar to the way the petitioner was accused of killing his victims). Such is not the case here.

For these reasons, defendants have failed to show that Hartridge's nondisclosure of his alleged arrest and arraignment concealed a bias against them that would have supported a for-cause challenge. Accordingly, defendants cannot use this nondisclosure to support their motion for a new trial.

### B. *Hartridge's Court Appearances and Lawsuits*

Defendants also assert that Hartridge failed to disclose that he and members of his family had been sued and that he had appeared in court several times. The grounds for these allegations are several judgments entered against Hartridge and Hartridge's relatives in the New York City Civil Court. Defendants uncovered the records of two judgments filed against Hartridge in 1990 and 1991, and more recent judgments filed against his wife and son. Another default judgment, for $11,393, was filed against Hartridge and his wife in 1997. According to defendants, these judgments and other proceedings demonstrate that Hartridge lied when he answered "no" to the question, "Have you or has anyone close to you ever ... [b]een sued by someone?" and when he indicated, in answer to the question, "Have you ever been in court before, other than for a minor traffic violation?" that he had been in court in a dispute with his landlord.

Several of these claims are of dubious significance with respect to Hartridge's *voir dire* disclosures. Most of the judgments were for less than $3,500, and several are over a decade old, suggesting that Hartridge may have forgotten about them. Several others are default judgments, which indicates that Hartridge did not appear in court in connection with them. Defendants have not produced any evidence that Hartridge knew about the judgments against his family members.

 The only questionable omission is the 1997 judgment for $11,393 against Hartridge and his wife. Assuming Hartridge had notice of this suit, the size of the judgment and its comparatively recent date suggest that he may have deliberately omitted it when he stated that he had never been sued. But defendants offer no explanation as to how the fact that a court has entered a judgment against a prospective juror supports an inference that the individual would be biased against defendants in a completely unrelated case. This information would not have supported a

for-cause challenge, and accordingly cannot support defendants' Rule 33 motion.

## C. *Hartridge's Son's Conviction for Attempted Robbery*

Defendants also point to Hartridge's failure to disclose that his son, Maurice Hartridge, was convicted of attempted robbery in the second degree in 2000. Defendants submit documentation of Maurice Hartridge's arrest, indictment, and sentence.

 Defendants have raised a serious question concerning whether Hartridge deliberately omitted information concerning his son's arrest when he answered "no" to the question: "Have you or has a family member or close friend ever been questioned by law enforcement, accused of, charged with, or convicted of any crime, or been the subject of a criminal investigation, other than a minor traffic violation?" However, defendants have still failed to demonstrate how that information would have supported a for-cause challenge of Hartridge. It is difficult to see how information concerning Hartridge's son's conviction for an attempted robbery—a crime unrelated to the crimes charged in this case—could justify an inference that Hartridge would be biased against these defendants. If anything, a prospective juror with a family member who had been convicted of a crime would more likely be considered biased in *favor* of criminal defendants. At any rate, defendants offer no authority for the proposition that this conviction would support a for-cause challenge. Defendants have failed to satisfy the second prong of the *McDonough* test with respect to this allegation.

## D. *Defendants' Remaining Allegations*

 Defendants also claim that Hartridge embezzled money from the Kingsbridge Little League ("KLL") during his tenure as volunteer treasurer of that or-

ganization in the mid–1990s. According to defendants, this information reveals that Hartridge lied when he answered "no" to the question: "Have you or has anyone close to you ever ... [b]een accused of wrongdoing on a job?" Defendants concede that Hartridge served as a volunteer treasurer, but nevertheless argue that this is the type of "job" the questionnaire contemplates.

 Defendants have not demonstrated that Hartridge failed to answer this question honestly. The relevant question asks about accusations of wrongdoing on a job. The common understanding of the word "job" is a position for which a person receives remuneration. A volunteer position is therefore not a job. "Jurors cannot be faulted if they fail to disclose information about which they were not asked." *Crawford v. Greiner*, No. 02 Civ. 7636(NRB), 2003 WL 21714932, at *3 (S.D.N.Y. July 23, 2003). Furthermore, defendants' evidence consists almost entirely of affidavits containing hearsay statements from individuals with no personal knowledge of the facts. Several of these affidavits note that the KLL board declined to take action in response to Hartridge's supposed improprieties. Accordingly, even if the allegations against Hartridge had merit, it is not clear that he was formally "accused" of anything.

 Defendants also allege that Hartridge may have been fired from his job at Citibank for abusing drugs or for improper expense accounting. According to defendants, if Hartridge was indeed terminated for one of these reasons, his answer to the question noted above was dishonest. Defendants' support for this allegation is wholly inadequate. They rely in part on the statements of a former KLL official who appears to be repeating rumors, and who has no personal knowledge of matters relating to Hartridge's employment at Ci-

tibank. They also rely on an anonymous telephone call received by Stewart's lawyer from an individual purporting to work for Citibank. Defendants do not explain how such a tenuous and unverifiable source of information could possibly justify further inquiry. As the Second Circuit pointed out, in affirming the denial of an evidentiary hearing with respect to allegations that jurors had received extraneous prejudicial information, to overcome the traditional reluctance to engage in postverdict scrutiny of juror conduct, "there must be 'clear evidence', 'strong evidence', 'clear and incontrovertible evidence', 'substantial if not wholly conclusive evidence.'" *King v. United States*, 576 F.2d 432, 438 (2d Cir. 1978) (quoting *United States v. Dioguardi*, 492 F.2d 70, 78, 79, 80 (2d Cir.1974)). Gossip and anonymous tips do not satisfy this standard.

### III. *Defendants' Request for an Evidentiary Hearing*

Defendants have presented evidence that Hartridge failed to disclose information regarding a lawsuit against him and his son's criminal conviction. The remainder of their allegations are not sufficiently concrete and nonspeculative to constitute a "pattern of nondisclosure" or to raise an inference that any wrongdoing occurred.

Although defendants have satisfied the first prong of the *McDonough* test with regard to two of their allegations, nothing they have submitted shows that Hartridge was biased or prejudiced against them before the trial started, or that he had prejudged the evidence. Examined closely, Hartridge's comments simply do not betray the prejudice that defendants attribute to him.

 Defendants speak vaguely of an evidentiary hearing, but they have not of-

fered a single, nonspeculative question, the answer to which would show bias or prejudice on the part of Hartridge. Most importantly, an evidentiary hearing cannot help defendants satisfy the second prong of the *McDonough* inquiry, because none of the information Hartridge is accused of withholding would give rise to an inference of bias, either for or against defendants, that would support a for-cause challenge. Furthermore, to permit an inquiry based on such scant evidence in a case that continues to receive an unprecedented level of publicity would do serious damage to the policies that justify limitations on postverdict juror scrutiny.[5]

### Conclusion

Defendants have failed to demonstrate that Hartridge's purported nondisclosures justify vacating their convictions and granting a new trial. This is not to condone deliberate nondisclosure during *voir dire*, for it is extremely unfortunate that a prospective juror would approach this important phase of a trial with a lack of candor. But the law is clear that lack of candor, in the absence of evidence of bias, does not undermine the fairness of defendants' trial. Accordingly, defendants' motion is denied.

SO ORDERED.

---

5. It is interesting to note, in this regard, that the media appear to have received copies of defendants' motion papers before the court did.